AO 440 (Rev. 10/93) Summons in a Civil Action - SDNY WEB 4/99

# United States District Court

_____ **SOUTHERN** _____     **DISTRICT OF** _____ **NEW YORK** _____

WALTER EARL LEWIS, on behalf of himself and
a class of persons similarly situated,

**SUMMONS IN A CIVIL CASE**

                          Plaintiff,

**V.**

CASE NUMBER:

AMERICAN INTERNATIONAL GORUP, INC.,
MARTIN J. SULLIVAN, RICHARD GROSIAK,
DAVID L. HERZOG, AXEL I. FREUDMAN, JOHN
AND JANE DOES 1-10 (BEING CURRENT AND
FORMER MEMBERS OF THE AIG RETIREMENT

**08  CV  6109**

    TO: (Name and address of defendant)

    AMERICAN INTERNATIONAL GROUP, INC.
    70 Pine Street
    New York, New York

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

    SQUITIERI & FEARON, LLP
    32 East 57th Street
    12th Floor
    New York, New York 10022

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period
of time after service.

## J. MICHAEL McMAHON

CLERK

JUL 0 3 2008

DATE

(BY) DEPUTY CLERK

AO 440  (Rev. 10/93)  Summons In a Civil Action -SDNY  WEB 4/99

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐  Served personally upon the defendant.  Place where served: _____
_____

☐  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____
_____

☐  Returned unexecuted: _____
_____
_____
_____

☐  Other *(specify):* _____
_____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                        Date                                      Signature of Server


                                               _____
                                               Address of Server

---

(1)    As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

## RIDER TO SUMMONS

MARTIN J. SULLIVAN
c/o AMERICAN INTERNATIONAL GROUP, INC.
70 Pine Street
New York, New York 10270

RICHARD A. GROSIAK
c/o AMERICAN INTERNATIONAL GROUP, INC.
70 Pine Street
New York, New York 10270

DAVID L. HERZOG
c/o AMERICAN INTERNATIONAL GROUP, INC.
70 Pine Street
New York, New York 10270

AXEL I. FREUDMANN
c/o AMERICAN INTERNATIONAL GROUP, INC.
70 Pine Street
New York, New York 10270

JOHN AND JANE DOES 1-10
(BEING CURRENT AND FORMER MEMBERS OF
THE AIG RETIREMENT BOARD)
c/o AMERICAN INTERNATIONAL GROUP, INC.
70 Pine Street
New York, New York 10270

JOHN AND JANE DOES 11-20
(BEING CURRENT AND FORMER MEMBERS OF
THE AIG INVESTMENT COMMITTEE MEMBERS)
c/o AMERICAN INTERNATIONAL GROUP, INC.
70 Pine Street
New York, New York 10270

08 CV 6109

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WALTER EARL LEWIS, on behalf of himself and a class of persons similarly situated,<br><br>                 Plaintiff,<br><br>    -against-<br><br>AMERICAN INTERNATIONAL GROUP, INC., MARTIN J. SULLIVAN, RICHARD GROSIAK, DAVID L. HERZOG, AXEL I. FREUDMAN, JOHN AND JANE DOES 1-10 (BEING CURRENT AND FORMER MEMBERS OF THE AIG RETIREMENT BOARD), JOHN AND JANE DOES 11-20 (BEING CURRENT AND FORMER MEMBERS OF THE AIG INVESTMENT COMMITTEE),<br><br>                 Defendants. | Civil Action No.:<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA** |

Plaintiff, Walter Earl Lewis, a participant in and beneficiary of the AIG Incentive Savings Plan (the "Plan"), on behalf of himself and a Class of all other participants in and beneficiaries of the Plan ("Class Members"), alleges the following based upon personal knowledge as to the facts pertaining to himself and on information and belief as to all other facts:

## NATURE OF THE ACTION

1.      This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act, as amended ("ERISA"), 29 U.S.C. §1132, against fiduciaries of the Plan who are and were responsible for the investment of the Plan's assets and its administration. As alleged herein, the Plan fiduciaries breached their fiduciary duties – duties they owed to Plan participants – causing the loss of millions of dollars of Plan participants' retirement savings.

2.    This action is brought on behalf of the Plan and seeks recovery for losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, and other monetary relief.

3.    Plaintiff was an employee of defendant American International Group, Inc. ("AIG") and/or one of its subsidiaries and was, and is, a participant in and beneficiary of the Plan.  As a participant in the Plan, Plaintiff was entitled to set aside a certain percentage of his annual base salary for investment of those funds through the Plan.  Among the investment options available to Plan participants was investment in AIG common stock.  Defendants encouraged Plan participants to purchase as many shares of AIG stock as possible in their retirement savings accounts.

4.    During the Class Period (as defined below), based in part on statements made by the Defendants, Class Members believed that AIG stock was a financially sound investment for their retirement accounts.  In turn, Class Members continued to allocate significant amounts of their individual contributions to AIG stock and to maintain their assets in that investment option.

5.    However, from at least the beginning of 2007 through the present, AIG common stock has been an imprudent investment for the Plan because: (1) AIG's had over a half-trillion dollar exposure to the United States residential mortgage investment market which subjected AIG to the risk of massive losses of assets and stockholders' equity; (2) AIG's risk management systems were inadequate to allow management to track and hedge the foregoing risks; (3) AIG's valuation system for its financial instruments was flawed and based upon estimates and estimating systems that were inconsistent with AIG's information about real-world transactions in the same and similar instruments; (4) AIG's accounting systems were fraught with material weaknesses that rendered the

reports and valuations generated through those accounting systems inherently unreliable. In short, any reasonable fiduciary in possession of even a fraction of the true facts extant at AIG during 2007 and 2008 would have avoided investment in AIG common stock and would have divested and/or hedged the AIG common stock in its participants' portfolios.

6. The Plan fiduciaries' failures morphed from reckless failures in early calendar year 2007 to bad faith dereliction of their fiduciary duties beginning in summer of 2007, at which time financial instruments linked to sub-prime mortgages were showing massive losses in debt markets and materially adversely affecting financial companies, including banks, broker-dealers and investment banks.

7. The Plan fiduciaries turned a blind eye to the fact that while the credit markets were crumbling and dragging down the value of financial instruments carried by AIG, AIG utilized a generic credit spreads valuation model instead of using actual market data. As Plan fiduciaries understood, use of such actual market data allowed AIG to justify its retention of these investments in its portfolio, and allowed AIG to avoid the mark down that would have resulted if these investments were sold (as they should have been in the best interests of AIG and Class Members) to avoid further losses. Because the fiduciaries understood that AIG was holding, rather than divesting itself of its worst investments, the fiduciaries knew and understood that AIG stock was an imprudent investment.

8. Notwithstanding the imprudence of investing retirement plan assets in AIG common stock, AIG assured participants that AIG's exposure to the deteriorating housing market was, "close to zero."

9. Beginning in February 2008, catastrophic news concerning AIG's credit portfolio valuation surfaced publicly exposing, for the first time, what Plan fiduciaries had known or

reasonably should have known, throughout 2007. AIG began issuing a series of press releases and regulatory filings in which it reported losses in its credit portfolio and increased write-offs of its assets and dilutive equity offerings.

10.    In fact, on May 8, 2007, AIG issued a press release entitled "AIG Reports First Quarter 2008 Results" in which it reported losses of $7.81 billion (on top of billions of losses previously reported at the end of 2007 and later revised upwards by 400% in early 2008) for the first quarter of 2008. AIG reported that the billions of dollars in losses were due primarily to $9.11 billion net unrealized market valuation loss on its "super senior credit default swap portfolio" and $6.09 billion from "other than temporary impairment charges" on certain residential mortgage backed securities and other structured securities in the first quarter. Shortly thereafter, in late May 2008, a multitude of the major rating agencies downgraded their ratings on AIG.

11.    On news of AIG's reported first quarter losses, shares of AIG common stock dropped approximately 11% from an opening price of $45.44 per share on May 8, to a closing price of $40.28 per share on May 9.

12.    Then, on June 6, 2008, AIG announced that the Securities and Exchange Commission ("SEC") was investigating whether AIG had overstated the value of its credit default swaps linked to subprime mortgages.[1]  As numerous media outlets reported, the United States Department of Justice's ("DOJ") request that the SEC turn over its findings to the DOJ signals that a criminal investigation against AIG could follow.

---

[1]    Throughout the Class Period, AIG's credit default swaps insured against the default of various securities, such as subprime mortgage bonds.

13.    On news of the SEC and DOJ investigations, the price of AIG common stock dropped another 6.8% from a closing price of $36.41 per share on June 5 to a closing price of $33.93 per share on June 6, an 11-year low for AIG stock.

14.    Tellingly, in only one year, the price of AIG common stock has fallen more than 50% with little hope of recovery to its former heights because of impairments to AIG's business and capital and the need for further dilutive capital rising.

15.    Plaintiff alleges in Count I that the Defendants responsible for the investment of the assets of the Plan breached their fiduciary duties to prudently and loyally manage the Plan. In Count II, Plaintiff alleges that Defendants who communicated with Class Members regarding the Plan's assets, or had a duty to do so, failed to provide Class Members with complete and accurate information regarding AIG stock sufficient to advise Class Members of the true risks of investing their retirement savings in AIG stock. In Count III, Plaintiff alleges that Defendants, responsible for the selection, removal, and, thus, monitoring of the Plan's fiduciaries, failed properly to monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate. In Count IV, Plaintiff alleges that the Defendants breached their fiduciary duty of loyalty by acting in furtherance of their personal interests as employees or executives of AIG at the expense of the best interests of the Plan. In Count V, Plaintiff alleges that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring. Finally, in Count VI, Plaintiff states a claim against AIG for knowing participation in the fiduciary breaches alleged herein.

16.    Defendants' breaches of their fiduciary duties owed to Plan participants revolve around their continued imprudent investment in AIG stock, and purchases of AIG common stock

5

during the Class Period.  Further, Defendants failed to inform Plan participants that material public

statements about AIG's businesses, current and future financial prospects and results were false and

misleading, thereby causing AIG's stock to trade at artificially inflated levels throughout the Class

Period.

17.    Thus, Defendants breached their fiduciary duties owed to the Plan and its participants

and beneficiaries under ERISA by, among other things:

(a)    Selecting and maintaining AIG stock as an investment alternative for

Participant contributions under the Plan when it was no longer a suitable or prudent Plan investment

option;

(b)    Encouraging AIG employees to invest in AIG stock;

(c)    Failing to divest the Plan from shares in AIG stock when continuing to hold

that investment option became imprudent as a result of the undisclosed financial and operating

performance of the Company;

(d)    Failing to provide accurate, material information to enable Plan participants to

make informed investment decisions concerning their contributions invested in the Plan; and

(e)    Abdicating their continuing duty to review, evaluate and monitor the

suitability of the Plan's investment in AIG stock.

18.    At the outset of and throughout the Class Period, Defendants failed to disclose

material facts about AIG's business operations.  When AIG finally disclosed the true facts behind its

financial health and the true state of its operations, the value of AIG stock declined precipitously,

taking with it the value of Plan participants' retirement savings, including those of Plaintiff and the

Class.

19.    Since the Plan's holdings in AIG stock comprised a significant percentage of the overall value of the assets the Plan held on behalf of its beneficiaries, the long-term retirement savings of Plaintiff and members of the Class were dependent, to a substantial degree, on the performance of AIG common stock. So, too, were their retirement fortunes dependent upon the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of Plan assets.

20.    As a result of Defendants' breaches of their fiduciary duties, the Plan and indirectly, its participants and beneficiaries, has suffered substantial losses of retirement savings and anticipated retirement income from the Plan. As such, under ERISA, Defendants are obligated to restore to the Plan the losses that resulted from their breaches of their fiduciary duties.

21.    Because Plaintiff's claims apply to the Plan's participants and beneficiaries as a whole and because ERISA authorizes participants, such as Plaintiff, to sue for breaches of fiduciary duty on behalf of the Plan, Plaintiff brings this as a class action on behalf of himself and all participants and beneficiaries of the Plan during the Class Period.

22.    In addition, because the underlying information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, amend his Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

23.    **Subject Matter Jurisdiction.** This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

7

24.     **Personal Jurisdiction.** ERISA provides for nation-wide service of process.  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or are subject to service in the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

25.     **Venue.**  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and/or some Defendants reside or maintain their primary place of business in this district.

## THE PARTIES

26.     Plaintiff, Walter Earl Lewis, is a resident of the state of Maryland.  During the Class Period, Plaintiff was an employee of AIG, and/or one of its subsidiaries, and is a participant in the Plan pursuant to ERISA § 3(7), 29 U.S.C. § 1102(7).  Among other available Plan options, Plaintiff invested in AIG stock in his retirement account.

27.     Defendant AIG is a Delaware corporation with its principal executive offices located at 70 Pine Street, New York, New York.  During the Class Period, AIG's common stock traded on the New York Stock Exchange.

28.     AIG is the Plan sponsor and administrator and exercises discretionary authority – acting through its officers, directors and employees – with respect to management and administration of the Plan and/or management and disposition of Plan assets.

29.     During the Class Period, AIG had effective control over the activities of its officers, directors and employees, including their Plan-related activities.  Through its officers, directors, and

employees, AIG had the authority and discretion to hire and to terminate its officers, directors, and employees who were responsible for the management and administration of the Plan.

30.     Through defendant Martin Sullivan ("Sullivan"), AIG also had the authority and discretion to appoint, monitor, and remove officers and employees form their individual fiduciary roles with respect to the Plan. By failing properly to discharge their fiduciary duties under ERISA, the Defendants named herein breached the duties they owed to Plaintiff and members of the Class.

31.     Defendant Sullivan was at all time relevant hereto Chief Executive Officer of AIG and Chairman of AIG's Board of Directors (the "Board"). Defendant Sullivan was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) management and administration of the Plan and/or (ii) management and disposition of the Plan's assets.

**AIG Retirement Board Defendants**

32.     Defendant AIG Retirement Board and its Members. As explained below, the AIG Retirement Board had general responsibility for the administration of the Plan. At all relevant times, the members of the AIG Retirement Board were, upon information and belief, all employees, officers, and/or directors of AIG.

33.     The following individuals were members of the AIG Retirement Board during the Class Period:

(a)     Defendant Richard A. Grosiak ("Grosiak"). During the Class Period, defendant Grosiak also served as the Director of Employee Benefits, a designated administrator of the Plan, a member of the Investment Committee, and a member of the Administrative Board, as described below.

9

(b)     Defendant Axel I. Freudmann ("Freudmann").  During the Class Period, defendant Freudmann also served as Senior Vice President of Human Resources and a designated administrator of the Plan.

(c)     John and Jane Does 1-10.  Plaintiff does not currently know the identity of all the AIG Retirement Board members during the Class Period.  Therefore, some of the members of the AIG Retirement Board are named as defendants John and Jane Does 1-10.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

**AIG Investment Committee Defendants**

34.     Defendant AIG Investment Committee and Its Members.  As explained below, the AIG Investment Committee assisted the AIG Retirement Board in monitoring the Plan's investment options.

35.     The following individuals were members of the AIG Investment Committee during the Class Period:

(a)     John and Jane Does 11-20.  Plaintiff does not currently know the identity of any of the Investment Committee members during the Class Period.  Therefore, the members of the Investment Committee are named as defendants John and Jane Does 11-20.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action, pursuant to Rule 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of himself and all others similarly situated who were participants in or beneficiaries of the Plan between May 11, 2007 through and including the present (the "Class Period").

37.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, several thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

38.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact commons to the Class are:

(a)    Whether the Defendants each owed a fiduciary duty to Plaintiff and the Class;

(b)    Whether the Defendants breached their fiduciary duties to Plaintiff and the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)    Whether the Defendants violated ERISA; and

(d)    Whether the Plaintiff and members of the Class have sustained damages and, if so, what is the appropriate measure thereof.

39.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the Class members each sustained damages arising from Defendants' wrongful conduct in violation of ERISA.

40.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and complex litigation under federal law. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41.    Class action status in this ERISA action is warranted under Fed.R.Civ.P. 23(b)(1)(B) because prosecution of separate actions by individual members of the Class would create the risk of

adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

42.    Class action status is also warranted under the other subsections the other sections of Fed.R.Civ.P.23(b) because:

(a)    Prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants;

(b)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole; and

(c)    Questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## THE PLAN

**A.    Nature of the Plan**

43.    The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, the Plan is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k). While the Plan is not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

44.    At all relevant times, the Plan had two separate components: (1) a contributory portion, which consisted of participant contributions; and (2) a matching component, which consisted entirely of employer contributions.

**B.    The Plan Documents**

45.    An employee benefit plan, including the Plan here, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(l), 29 U.S.C. 1102(a)(1). During the Class Period, the Plan was maintained under the instruments:

- the American International Group, Inc. Incentive Savings Plan, Amended and Restated as of January 1, 2000 ("2000 MG Plan Document");  and

- the American International Group, Inc. Incentive Savings Plan, Amended and Restated as of January 1, 2002 ("2002 MG Plan Document").

46.    ERISA and the Internal Revenue Code require that Plan file an Annual Report, Form 5500, with the Department of Labor and the Department of the Treasury. The most recent such Annual Report for the Plan is the 2006 Form 5500, for the plan year ending December 31, 2006.

47.    The assets of an employee benefit plan, such as the Plan, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Plan were held in trust pursuant to various trust and service agreements.

**C.    Plan Descriptions And Provisions**

48.    Throughout the Class Period, participants in the Plan were permitted to defer a percentage of their base compensation for investment in the plan. Participants were permitted to contribute between 1% and 50% of their base compensation, subject to limits in the Tax Code, for investment in the Plan.

49.    AIG matched up to the first 6% invested by participants in the AIG Incentive Savings Plan depending on the participant's years of employment.

50.    For participants with fewer than five years of service, the match was 33 1/3% of the participant's first 6% of salary contributed; between five and ten years of service, the match was 66 2/3% of the participant's first 6% of salary contributed; after ten years of service, the match increased to 100% of the participant's first 6% of salary contributed.

51.    Effective January 1, 2003, the match increased as follows: for participants with fewer than five years of service, the match is 33.333% of the participant's first 6 % of salary contributed; between five and ten years of service, the match is 75% of the participant's fast 6% of salary contributed; after ten years of service, the match is 116.667% of the participant's first 6 % of salary contributed.

52.    Participants directed the investment of their contributions and the company match to various investment options in the Plan.  Most of the options were diversified mutual funds. However, among these options was the AIG Stock Fund.

53.    In the Plan, only AIG's employer matching contributions were eligible to be invested in the AIG Stock Fund.

54.    Participants were encouraged to invest the employer match in the AIG Stock Fund: while the Plan's Summary Plan Description ("SPD") acknowledged the higher risk of investing in a single security than a diversified portfolio, the SPD touted the AIG Stock Fund as having "a higher appreciation potential, since it is tied directly to AIG's performance in the market."

**AIG Stock Fund**

55.    The AIG Stock Fund holds the Plan's shares of AIG stock.  The AIG Stock Fund was designed to invest "mainly," not exclusively, in AIG stock.

14

56.    Throughout the Class Period, and before, the Plan's assets were heavily invested in the AIG Stock Fund.

57.    Certain restrictions apply to the AIG Stock Fund.  If a Plan participant transfers any money out of the AIG Stock Fund, the participant cannot reinvest that money into the AIG Stock Fund at a later time.  This provision had the effect of discouraging Plan participants from reducing their holdings in AIG stock and worked against the participants' interest in situations where participants may have wanted to reduce such holdings to stem losses, but were reluctant to do so for fear of potentially waiving their ability to reinvest those monies in AIG stock at a later time if conditions for such an investment and prospects for gains became more favorable.

## DEFENDANTS' FIDUCIARY STATUS

### A.    The Nature of Fiduciary Status

58.    *Named Fiduciaries.*  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

59.    *De Facto Fiduciaries.*  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who, in fact, perform fiduciary functions.  Thus, a person is a fiduciary to the extent : "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

60.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the Plan's participants under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

61.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, as well as the Plan's investments, solely in the interest of the Plan's participants and beneficiaries. As fiduciaries, Defendants were required to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

62.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

63.    ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still act solely in the interest of participants and beneficiaries, not in the interest of the sponsor. Moreover, all fiduciaries of the Plan were obliged, when wearing their fiduciary hat(s) to act independently of AIG which had no authority under the governing Plan's documents to direct the conduct of any of them with respect to the Plan, investments therein, or the disclosure of information between and among fiduciaries or from fiduciaries to the participants.

**B.    AIG**

64.    Pursuant to the Plan documents for the Plan, AIG is responsible for appointing, removing and monitoring the Plan's Administrator (the AIG Retirement Board, as described below), the Plan's Trustee, and any and all other persons to whom it assigned fiduciary responsibility.

65.    If AIG did not designate the AIG Retirement Board to serve as the Plan Administrator for the Plan, then pursuant to the Plan's documents, AIG served as the Plan's Administrator.

66.    Additionally, AIG had the authority and discretion to select the investment funds available for the Plan.

67.    According to these documents, in selecting investments for the Plan, AIG was to "use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use..."

68.    Thus, AIG had the discretion and authority to suspend, eliminate, or reduce any of the Plan's investments, including investments in the AIG Stock Fund.

69.    AIG was also responsible for designating the procedures for the investment of Trust assets for the Plan.

70.    Moreover, AIG, at all applicable times, exercised control over the activities of its officers and employees that performed fiduciary functions with respect to the Plan, including the AIG Retirement Board members and the AIG Investment Committee members, and could terminate, and replace such employees at will.    AIG is thus responsible for the activities of its officers and employees through principles of agency and *respondeat superior* liability.

71.    Finally, as a matter of corporate law, AIG is imputed with the knowledge that the Defendants, including defendant Sullivan, had of the misconduct alleged herein, even if not communicated to AIG.

17

72.    Consequently, in light of the foregoing duties, responsibilities, and actions, AIG was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

73.    AIG, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, AIG relied and continues to rely directly on the Board, in particular defendant Sullivan, to carry out its fiduciary responsibilities under the Plan and ERISA.

**C.    AIG Retirement Board Defendants**

74.    As set forth in the Plan Documents for the Plan, the AIG Retirement Board Defendants are named fiduciaries of the Plan.

75.    Upon information and belief, AIG, through its Board, appointed the AIG Retirement Board Defendants to serve as the Plan Administrator for the Plan. As stated above, if AIG did not appoint AIG Retirement Board to serve as the Plan Administrator, then AIG served as the Plan's Administrator; however, upon information and belief, AIG, through its Board, did appoint the AIG Retirement Board to serve as the Plan Administrator.

76.    As the Plan Administrator, the AIG Retirement Board had all powers necessary to administer the Plan, including the power to construe and interpret the Plan documents. All construction, interpretation, and application of the Plan by the AIG Retirement Board, as the Plan Administrator, were final, conclusive and binding.

77.    Additionally, as the Plan Administrator for the Plan, the AIG Retirement Board had the power to appoint or employ advisors to render advice with respect to the AIG Retirement Board's responsibilities under the Plan.

78.     As the Plan Administrator, the AIG Retirement Board had the power to establish investment guidelines with respect to the investment of the assets of the Plan.

79.     On or around July, 2002, the AIG Retirement Board exercised its power to designate other persons to carry out its duties under the Plan, by appointing an Investment Committee to assist the AIG Retirement Board in monitoring investment options as described below.

80.     Upon information and belief, the AIG Retirement Board made recommendations regarding the Plan's investment options, including the AIG Stock Fund, to the Board, acting on behalf of the AIG.

81.     Moreover, as the Plan Administrator, the AIG Retirement Board was responsible for furnishing the Trustee with written instructions regarding all Contributions to the Trust, all distributions to Participants, all withdrawals by Participants, along with providing the Trustee with any further information respecting the Plan that the Trustee may request.

82.     Upon information and belief, the AIG Retirement Board exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA. In this regard, on behalf of AIG and the AIG Board, the AIG Retirement Board disseminated the Plan's documents and materials.

83.     Consequently, in light of the foregoing duties, responsibilities, and actions, the AIG Retirement Board Defendants were named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and were *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**D.**    **AIG Investment Committee Defendants**

84.    The AIG Retirement Board appointed an Investment Committee to assist the AIG Retirement Board in monitoring the investments of the Plan and the Plan's investments, including investments in AIG stock.  Upon information and belief, the AIG Investment Committee Defendants had the ensuing duties: to develop investment policy guidelines and objectives; to monitor performance results to ensure that the guidelines and objectives are met; to select investment managers, meet with the investment managers to review their investment results, and to the appropriate action if investment managers fail to perform as expected; and to monitor legal and regulatory issues applicable to investment policy.

85.    Upon information and belief, the AIG Investment Committee Defendants made recommendations regarding the Plan, to the AIG Retirement Board and/or the AIG Board of Directors, acting on behalf of AIG.

86.    Finally, upon information and belief, the AIG Investment Committee Defendants had the responsibility to provide complete and accurate information to participants about the investment offerings in the Plan, either directly or by communicating that information to the AIG Retirement Board.

87.    Consequently, in light of the foregoing duties, responsibilities, and actions, the AIG Investment Committee Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

88.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to §3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets, and had discretionary authority or responsibility for the administration of the Plan.

89.    During the Class Period, all defendants were directly involved with the administration of the Plan and the investment of its assets.

90.    AIG did not delegate all fiduciary responsibilities for the Plan to an external provider. Instead, Defendants chose to comply with ERISA §402(a)(1), internalizing many fiduciary functions. ERISA § 402(a)(1), 29 U.S.C. §1102(a)(1), requires that every plan provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the Plan."

91.    During the Class Period, AIG's direct and indirect communications with the Plan's participants included statements regarding investments in AIG stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan-related documents, which incorporated and/or reiterated these statements. The Defendants acted as fiduciaries with respect to these communication activities.

## SUBSTANTIVE ALLEGATIONS

92.    AIG was heavily invested in the United States residential mortgage market in 2006, 2007 and 2008, mainly through sub-prime mortgage investments or the securitization thereof.

93.    Sub-prime mortgages are mortgage loans made to borrowers who do not qualify for the best market interest rates because of their weaker credit histories or scores. Sub-prime mortgages have a higher rate of default than other mortgages. Sub-prime mortgages are also subject to higher rates of interest, reflecting their higher risk.

94.     Banks and other financial institutions, including AIG, securitize sub-prime mortgages into various securities, including collateralized debt obligations ("CDOs"), which they then sell to investors for later sale.

95.     In order to hedge their exposure to the risk of their investment in CDOs and other debt securities, investors in these securities buy credit default swaps, which obligate the issuer of the swap to make payments to the holder of the swap in the event of a failure to pay or other credit event in respect of the underlying debt. Even prior to the maturity of such payment obligations, the issuer of such credit default swaps may be required to make payments o f collateral support, or margin, as the prices of the underlying debt instruments decrease.

96.     The value of a CDO is derived from the quality of the underlying asset. The price of a swap is set by the expected likelihood of a default and the probable amount of the loss. The "value" of the swap is therefore the amount of payments due to the seller over the life of the swap less the likely default payments the seller will owe the purchaser. As the amount of the default payments increases, the value of the swap decreases.

97.     Since AIG has also sold credit protection as CDOs, AIG's portfolio also includes "derivative liabilities." As the value of the underlying CDO or other source of payments increases, the potential liability of the securitized CDO seller goes down. The lower potential liability means more of the premium AIG received in selling the credit protection is available as earnings but as potential default liability increases, AIG's premium will be used to pay for losses, and the Company's earnings will diminish as a result.

98.     AIG was exposed to the United States residential mortgage market in several key areas of its business. AIG is a mortgage originator of first-lien and second-lien residential sub-prime and other mortgages. AIG also invested in CDOs and other mortgage-backed securities

collateralized by residential mortgages. AIG securitizes the sub-prime mortgages it originates and markets the CDOs to investors. However, if these instruments cannot be marketed, AIG is forced to retain the exposure. AIG also provides credit default swaps ("CDS") that require AIG to afford credit protection to investors against losses on CDO portfolios.

99.     As of December 31, 2007, AIG was the counterparty on credit default swaps hedging the risk of failure to pay over one-half trillion dollars in debt including over $78 billion in CDOs.

### A.    The Imprudence Of Investing In AIG Stock Is Concealed By AIG's Assurances About Its Residential Mortgage Market Exposure

100.    An August 9, 2007 USA Today news article, entitled "AIG reassures investors about subprime," explained that "[a]s conditions in the credit market have tightened, investors have been sensitive to any sign of a ripple effect, in which the fallout from defaults on subprime loans would spread to other parts of the lending market. Any news of subprime mortgage or credit problems has sent stock prices reeling."

101.    Throughout the Class Period, in an effort to calm investor concerns over AIG's sub-prime related exposure, AIG assured investors that it would not be adversely affected by its exposure to the residential mortgage market and that AIG was unlikely to see any actual losses from its CDS portfolio.

102.    On August 8, 2007, AIG issued a press release entitled "AIG Reports Second Quarter 2007 Results," in which defendant Sullivan assured investors that "[AIG] continue[s] to be very comfortable with [its] exposure to the U.S. residential mortgage market, *both in our operations and our investment activities*." (emphasis added).

103.    An August 9, 2007 MarketWatch news article, entitled "AIG Comfortable With Mortgage-Market Exposure," reported that AIG had "downplayed concerns about its exposure to the

23

troubled U.S. housing market, noting that its investment in mortgage-backed securities and its lending business are meeting or exceeding performance targets."

104.    During a conference call held with investors on August 9, 2007, defendant Sullivan declared that AIG is "very comfortable with the size and quality of its investment portfolios and its operations" and that AIG even stands to take advantage of near "panic" in markets. Specifically, defendant Sullivan claimed that "Given the high quality of our investments and our superior financial strength, AIG is poised to take advantage of these opportunities as they arise."

105.    In fact, defendant Sullivan urged investors to consider AIG "a very safe haven in stormy times."

106.    During the same conference call, Joseph Cassano who was head of AIG Financial Products falsely assured investors that there was little or no risk to AIG's credit default swaps by claiming:

> It is hard to get this message across but these [credit default swaps] are very much handpicked.  We are very much involved in the process of developing the portfolios in which we are going to wrap, and then picking the attachment points.  People have been willing to work with us in order to do that, to create the value that they do in these underlying.  So the combination of the underlying credit quality, and then the stresses that we put it through to make sure that we can hit these marks *it is hard for us with, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions.*
>
> We wanted to make sure in this presentation, we broke out exactly what everything looked like in order to give everybody the full disclosure.  But we see no issue at all emerging.  *We see no dollar of loss associated with any of that [credit default swap] business.  Any reasonable scenario that anyone can draw and when I say reasonable, I mean a severe recession scenario that you can draw out for the life of those securities.*
>
> (emphasis added).

24

107.    The August 9, 2007 MarketWatch news article further cited Bob Lewis, AIG's chief risk officer and senior vice president, as stating that AIG doesn't expect to lose money on any of its residential mortgage-backed securities and that, "[i]t would take declines in housing values to reach depression proportions, along with default frequencies never experienced" before AIG's investments would be affected.

108.    In its Form 10-Q filed with the SEC on November 7, 2007, AIG stated that the credit and mortgage crisis had resulted in a small third quarter loss in its credit default swap portfolio ($352 million) and projected only slightly higher losses during the fourth quarter ($550 million).    AIG further assured investors that it "continues to believe that it is highly unlikely" that AIG Financial Products will be required to make payments under its portfolio of credit default swaps.[2]

109.    The following morning, AIG executives held a conference call with investors, during which Robert Lewis stated that the "ultimate credit risk actually undertaken is remote and has been structured and managed effectively. "

110.    During that conference call AIG maintained that:

> The loss taken this quarter reflects a change in the fair value of these derivatives due to the significant widening of credit spreads on the underlying collateral.  However it does not reflect a change in our view.  ***AIG does not expect to pay any losses on this carefully structured and well-managed portfolio.***  All Super Senior transactions are written to a zero loss standard; underlying collateral assets analyze the model to determine appropriate risk attachment points to that all transactions have significant subordination below AIGFP's attachment point.
>
> (emphasis added).

---

[2]    AIG Financial Products ("AIGFP") is the derivative unit of AIG that, among other things, enters into derivative transactions to meet the needs of counterparties who may be seeking to hedge certain aspects of such counterparties' operations or obtain a desired financial exposure.  Derivatives, are financial arrangements among two or more parties with returns linked to or "derived" from some underlying equity, debt, commodity or other asset, liability, or foreign exchange rate or other index or the occurrence of a specified payment event.

111.    The November 8, 2007 earnings call featured a PowerPoint "Residential Mortgage Presentation." The slide presentation furthered AIG's effort to mislead investors regarding its "super senior" credit default swap portfolios, stating that "AIG does not expect to be required to make any payments from this exposure."

112.    On December 5, 2007, AIG held an investor meeting for the purpose of discussing AIG's exposure to the residential mortgage market. During this meeting, Defendant Sullivan assured shareholders that the possibility that AIG's "super senior" credit default swap portfolio would sustain a loss was "close to zero" and that AIG is "confident of [its] marks and the reasonableness of [its] valuation methods." Defendant Sullivan also told investors that AIG had "a high degree of certainty in" the losses that AIG had "booked to date" and that the AIG's U.S. residential housing market exposure levels "are manageable given AIG's size, financial strength and global diversification." With respect to the valuation models, Defendant Sullivan claimed that AIG's models "have proven to be very reliable" and "provide AIG with a very high level of comfort." Defendant Sullivan concluded that "AIG has accurately identified all areas of exposure to the U.S. residential housing market."

113.    A May 9, 2008 Reuters news article, entitled "AIG Sees No Signs Of Mortgage Asset Market Rebound Yet," remarked how, in 2007, defendant Sullivan had "assured investors that AIG was unlikely to see any actual losses from its CDS portfolio."

114.    AIG's failure to disclose the true risks of AIG's exposure to mortgage-backed securities was summed up by Goldman Sachs analyst Thomas v. Cholnoky, who stated on August 9, 2007 that "The bottom line on subprime is that AIG disclosed no ticking time bomb as many had feared."

115.    To their detriment, investors and the Plan's participants had to take AIG at its word.

**B.**     **The Truth Emerges About AIG's True Financial Problems**

116.    In a Form 8-K filed with the SEC on February 11, 2008, AIG announced some stunning news to investors. First, AIG reported a decline in its credit-default swap portfolio of $4.88 billion dollars in October and November 2007 - over four times more than the $1.1 billion decline that AIG had previously announced.

117.    A February 11, 2008 CNNMoney.com news article, entitled "AIG's bad accounting day" reported that AIG's credit swap decline was even more damaging for the month December of 2007, as that month "saw the sharpest deterioration yet in that segment of the market, according to hedge fund traders."

118.    As a February 17, 2008 Associated Press news article, entitled "AIG's auditors force write-down due to flawed valuation," stated, AIG's disclosure that it was forced to take a $4.88 billion write-down was an unexpected "bombshell," as defendant Sullivan "had been telling investors AIG had "high degree of certainty" that it wouldn't have to book major write-downs even as other financial companies tallied $140 billion in credit-related charges during the last year."

119.    Second, AIG revealed that its independent auditors, PricewaterhouseCoopers LLC ("PWC"), have concluded that at December 31, 2007, "AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio." In another words, AIG used improper methods in its mark-to-market valuations on those derivatives when there had been no active market for the debt. By using certain negative basis adjustments, AIG was able to lower its mark-to-market losses.

120.    These February 11 disclosures sparked the worst one-day decline in AIG stock price in two decades. Shares of AIG stock plummeted from a closing price of $50.68 per share on February 8, 2008 to a closing price of $44.74 per share on the next trading day, February 11, 2008; a

drop of approximately 12%. Bond-rating and Fitch Ratings also announced the placement of AIG's issuer default rating on "negative" watch.

121.    The abovementioned February 17 Associated Press news article explained that "AIG has long been considered too complex for most investors to analyze, and has relied too often on 'trust me' statements. This news reinforced the downside of that."

122.    As AIG further revealed losses to its CDO portfolio and declines in its net income, shares of AIG common stock continued to tumble in value.

123.    In its Annual Report for the fiscal year ended December 31, 2007 filed with the SEC on February 28, 2008, AIG announced that it had taken an $11.1 billion write-down of credit-default swaps. A June 16, 2008 Bloomberg news article, entitled "AIG Chief Sullivan, From Assurances to His Ouster: Timeline," stated that the $11.1 billion write-down marked AIG's largest quarterly loss in its 89-year history.

124.    AIG further disclosed that it had purchased securities with a principal amount of approximately $754 million in CDOs and was further required to provide third parties with $3 billion in liquidity facilities to support future potential puts of CDOs. In 2007, it was known by AIG that CDO values and liquidity were quickly eroding and were adversely affecting AIG's business and would continue to do so.

125.    AIG also acknowledged the material weakness in is financial reporting, stating in its 2007 Annual Report that:

> During the evaluation of disclosure controls and procedures as of December 31, 2007 conducted during the preparation of AIG's financial statements to be included in this Annual Report on Form 10-K, *a material weakness in internal control over financial reporting relating to the fair value valuation of the AIGFP super senior credit default swap portfolio was identified. As a result of this material weakness,* described more fully below, AIG's Chief Executive

Officer and Chief Financial Officer concluded that, as of December 31, 2007, *AIG's disclosure controls and procedures were ineffective*.

Management of AIG is responsible for establishing and maintaining adequate internal control over financial reporting. AIG's internal control over financial reporting is a process under the supervision of A1G's Chief Executive Officer and Chief Financial Officer, designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of AIG's financial statements for external purposes in accordance with GAAP.

*As of December 31, 2007 controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not effective.* AIG had insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007. As a result, AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third parry information. Also, controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively. As a result, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements. In addition, this deficiency could result in a misstatement in management's fair value estimates or disclosures that could be material to AIG's annual or interim consolidated financial statements that would not be prevented or detected on a timely basis.

(emphasis added).

126.    AIG's 2007 Annual Report also included a report provided by PWC confirming that AIG's internal controls relating to the AIGFP super senior credit default swap portfolio valuation process had a material weakness and were ineffective. The report read in part:

Also in our opinion, *AIG did not maintain, in all material respects, effective internal control over financial reporting* as of December 31, 2007, based on criteria established in *Internal Control -*

*integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) because a **material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed** as of that date. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

(emphasis added).

127.    On May 8, 2008, AIG reported substantial losses for the first quarter of 2008. In a press release issued by AIG on May 8 entitled "AIG Reports First Quarter 2008 Results," AIG announced that it had incurred a net loss for the quarter of $7.81 billion or $3.09 per diluted share compared to a net income of $5.13 billion for the first quarter of 2007. This net loss stemmed largely from a decline in the value of assets linked to subprime mortgages. According to the press release, "[i]ncluded in the first quarter 2008 net loss and adjusted net loss was a pre-tax charge of approximately $9.1 billion ($3.92 billion after tax) for a net unrealized market valuation loss related to the AIG Financial Products Corp. ("AIGFP") super senior credit default swap portfolio."

128.    AIG further disclosed that its first quarter 2008 results included capital losses of $6.09 billion compared to capital losses of only $70 million in the first quarter of 2007. AIG stated that it incurred such capital losses "primarily from other-than-temporary impairment charges in AIG's investment portfolio." As AIG revealed, these other-than-temporary impairment charges "resulted primarily from the severe, rapid declines in market values of certain residential mortgage backed securities and other structured securities."

129.    Consequently, shares of AIG common stock fell over 11% from an opening price on May 8 of $45.44 per share to a May 9 closing price of $40.28 per share.

130.    Moreover, reporting on AIG's first quarter 2008 losses, a May 9 Reuters news article, entitled "AIG Sees No Signs Of Mortgage Asset Market Rebound Yet," stated that AIG "does not yet see signs of a rebound in the market for mortgage assets, which have cost it dearly over the past two quarters." Indeed, during the fourth quarter of 2007 and the first quarter of 2008, AIG recorded unrealized losses of approximately $20 billion in a credit swap portfolio.

131.    Steve Bensinger, who announced in May 2008 that he plans to step aside as AIG's chief financial officer, additionally acknowledged to investors that he did not yet see signs of a recovery in the structured credit market for residential mortgage securities, including subprime mortgages.

132.    As the above-mentioned May 9, 2008 Reuters news article further pointed out, "Now, analysts say [defendant] Sullivan must work to stem losses, shore up capital, and regain investors confidence, which has fallen as potential losses from credit swaps have ballooned."

133.    Tellingly, on May 11, 2008, Maurice R. Greenberg, former chief executive officer of AIG and AIG's largest individual shareholder sent a letter to the Board expressing his concern over AIG's reported losses and the effect thereof on investors.  The letter read in part:

> I am [as] concerned as millions of other investors *as I watch the deterioration of a great company*...
>
> AIG last week announced a net loss for the first quarter of 2008 of $7.81 billion, or $3.09 per diluted share. *It is the worst performance in AIG's approximately 40-year history* – and follows almost equally poor results from last quarter, which was the worst quarter in the company's history before this quarter. *Over the last twelve months, shareholders of AIG have lost $80 billion in the aggregate*.
>
> Several top shareholders of AIG have called me expressing deep concern about the persistent and seemingly endless destruction of value at AIG. They, and I, are deeply distressed by the excessive loss of value.

The facts are disturbing, for example:

- On December 5, 2007, management announced that the cumulative decline in the value of its super senior credit default swap portfolio was between $1.4 and $1.5 billion as of November 30, 2007;

- On February 11, 2008, that same estimate was increased by $4.5 billion to approximately $6.0 billion, and the company announced that the auditors found a material weakness in its internal controls over financial reporting and oversight;

- On February 28, 2008 (two weeks later), the company updated its estimate to reflect further valuation declines through December 31, 2007, and increased the cumulative valuation loss to $11.5 billion on the same portfolio. Leadership reiterated, however, that the company has $15 to $20 billion of excess capital;

- With the release of first quarter earnings on May 8, 2008, AIG announced that the portfolio lost an additional $9.1 billion in value -- and the company would need to raise $12.5 billion in capital.

*These events have led to a complete loss of credibility with the investment community and even further loss of value for shareholders...*

*AIG is in crisis.*

(emphasis added).

134.    On May 20, 2008, AIG raised over $20 billion in new capital to fortify itself from future losses related to its residential mortgage exposure (a substantial increase from its initial plan announced on May 8, 2008 to raise $12.5 billion), further underlining AIG's desperate financial condition.

135.    It is evident that Defendant Sullivan's assurances to investors during the December 6, 2007 meeting that the likelihood of AIG's credit default swap portfolio sustaining losses as a result of the residential mortgage market was "close to zero" were clearly false and misleading. In a June

16, 2008 news article by TheStreet.com entitled "The ABCs of AIG," financial analyst Jim Cramer was quoted as saying:

> You go back to that December 6th meeting and you realize that what you've got here is just an unfathomably bad portfolio...*[AIG] is a company that spent a full day [December 6, 2007] explaining to you why they had no problems and then six months later, it looks like they may be the worst [company in the financial sector].* This is a company that raised the dividend. Now they got to get rid of the dividend, if you ask me. This is *a company that assured you that it could buy back shares as it had great liquidity. Now it doesn't have any liquidity*...this is a deeply troubled company and I think they need to do two or three more financings...one of the things we learn is that *when you need more financing, your stock goes lower*.

(emphasis added).

136.    AIG felt further backlash from its disclosures regarding losses on its credit swap portfolio when, on June 6, 2008, the SEC launched an investigation into whether AIG overstated the value of credit default swaps linked to subprime mortgages. At the same time, the DOJ informed the SEC that it wanted all information from the SEC's investigation, thereby signaling that a criminal investigation could follow.

137.    On this news, shares of AIG common stock dropped another 7% from a closing price of $36.41 per share on June 5, to a closing price of $33.93 per share on June 6.

138.    As reported in a June 16, 2008 Reuters news article, entitled "AIG's New Chief Reaches Out To Former CEO Greenberg," AIG's shares are trading at less than half the value they held a year ago, after larger-than-expected write-downs on assets linked to subprime mortgages.

## C.    Defendants Regularly Communicated With Plan Participants Concerning Purchases Of AIG Stock, Yet Failed To Disclose The Imprudence Of Investing in AIG Stock

139.    Upon information and belief, Defendants regularly communicated with employees, including the Plan's participants, about AIG's performance, future financial and business prospects,

and AIG stock.    These cozy communications were directed specifically at employees/Plan participants. These communications occurred, for example, in newsletters, Plan documents, and the Plan's materials that were disseminated to all participants and beneficiaries.    As such, these communications were acts of the Plan's administration, and the persons responsible for the communications were ERISA fiduciaries in this regard.

140.    As a consequence of these communications, AIG fostered an inaccurately rosy picture of the soundness of AIG stock as an investment in the Plan.   As such, the Plan's participants could not appreciate the true risks presented by investments in AIG stock and therefore could not make informed decisions regarding investments in the Plan.

141.    Indeed, despite AIG's public assurances to investors about the strength of AIG's business and its CDS portfolio, as described in ¶¶ 101 through 115 above, Defendants knew or reasonably should have known that AIG's financial condition was nowhere as secure as it was described.  Throughout the Class Period, Defendants knew or reasonably should have known that it was only a matter of time before its own portfolio of investments with exposure to residential mortgages would have to be written down to reflect its loss of value because throughout 2007, more and more companies announced significant, crippling losses to their own portfolio of residential mortgage investments.  By the time these statements were made, Defendants knew or recklessly disregarded that since the beginning of the Class Period, there had been even greater losses to AIG's CDS portfolio directly attributable to the housing credit crisis.

142.    Defendants also knew or had access to non-public information, which demonstrated that AIG current stock was an imprudent investment for Plan participants' 401k accounts. Such non-public information included, among other things, the fact that AIG's credit default swap portfolio included $6.5 billion in liquidity puts written on CDOs exposed to United States residential sub-

34

prime mortgages. Through its investment in those puts, AIG knew, and all Defendants knew or should have known, that in 2007 the United States residential housing market was quickly declining and mortgage loan portfolios and CDOs based thereon were quickly losing value.

143.    Amidst the damaging disclosures and revelations of serious wrongdoing (as described in ¶¶ 116 through 138) AIG common stock was a far too risky and imprudent investment for the Plan; yet the Defendant fiduciaries failed to disclose such information to Plan participants and beneficiaries, and took no action to protect the Plan's assets. Instead, Defendants purchased additional AIG shares within the Plan and held existing shares as the stock price dropped further throughout late 2008.

144.    Accordingly, Defendants breached their fiduciary duties owed to the Plan and its participants and beneficiaries by failing to take action to protect the Plan's assets despite the fact that they knew or should have known about some or all of AIG's illegal and/or improper conduct and accounting practices. The result of the Defendants' imprudent investment in AIG stock was a massive loss of value in the Plan's holdings of AIG stock.

**THE RELEVANT LAW**

145.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

146.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be: personally liable to make good to such plan any losses to the plan resulting from each such breach; personally liable to restore to such plan any profits of such fiduciary which have been made through

use of assets of the plan by the fiduciary; and subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

147.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from plan fiduciaries, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

148.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B) provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

149.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance AIG Stock Fund, which invested in AIG stock, to ensure that each investment is a suitable option for the plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

150.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for relief to the Plan under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants in violation of ERISA § 404(a)(1) and ERISA § 405(a).

151.    Insofar as any Defendant is sued alternatively as a knowing participant in a breach of fiduciary duty for equitable relief, Plaintiff proceeds, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## ERISA § 404(C) DEFENSE INAPPLICABLE

152.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions.  In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

153.    ERISA § 404(c) does not apply here for several reasons.  First, ERISA § 404(c) does not and cannot provide any defense to the Plan fiduciaries' imprudent decision to select and continue offering AIG stock in the Plan, as that decision was not made or controlled by Plan participants. *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n. 27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550).

154.    Second, even as to participant directed investment in AIG stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding AIG stock. *See* 29 C.F.R § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, Plan participants did not have informed control over the portion of the Plan's assets that were invested in AIG stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that resulted from such investment.

155.    Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plan, the Plaintiff, and the Class for losses caused by the Plan's investment in AIG stock during the Class Period is established upon proof that such investments were or became imprudent and resulted in losses in the value of the Plan's assets during the Class Period.

## CAUSES OF ACTION

### COUNT I:

**Failure To Prudently And Loyalty
Manage The Plan And The Plan's Assets
Breaches Of Fiduciary Duties In Violation Of Erisa § 404 By All Defendants**

156.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

157.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, all Defendants were bound by the duties of loyalty, exclusive purpose, and prudence.

158.    As alleged above, AIG, as well as Defendant Sullivan, the AIG Investment Committee Defendants, and the AIG Retirement Board Defendants were responsible, in different

ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of AIG stock.

159.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a Plan's assets are responsible for ensuring that investment options made available to Participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Defendants, particularly the AIG Investment Committee, were responsible for ensuring that all investments in AIG stock in the Plan were prudent and that such investments were consistent with the purpose of the Plan. Defendants are thus liable for losses incurred as a result of such investments being imprudent.

160.    The Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(l)(B).

161.    According to Department of Labor ("DOL") regulations, a fiduciary's investment or investment course of action is prudent if: (i) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (ii) he has acted accordingly. *29 CFR 2550.404a-1*

162.    DOL regulations further specify that "appropriate consideration" in this context includes, but is not necessarily limited to:  (i) A determination by the fiduciary that the particular

investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) consideration of the following factors as they relate to such portion of the portfolio:

     (a)    The composition of the portfolio with regard to diversification;

     (b)    The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

     (c)    The projected return of the portfolio relative to the funding objectives of the plan. *Id.*

163.    Moreover, a fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives which it knows, or reasonably should know, would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

164.    Contrary to their duties and obligations under the Plan's documents and ERISA, the Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, Defendants knew, or should have known, that AIG no longer was a suitable and appropriate investment for the Plan, but was, instead, a highly speculative, artificially inflated, and risky investment in light of AIG's extensive exposure to the residential mortgage market, losses suffered from AIG's CDS portfolio, improper accounting practices, and misleading financial statements and disclosures. Nonetheless, during the Class Period, Defendants continued to offer

AIG stock as an investment option for employer contributions and to severely restrict Plan participants' ability to sell shares of AIG stock.

165.    In making the above-described decisions regarding the Plan's investment in AIG stock, under the circumstances alleged herein, Defendants abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made a different investment decision. Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plan's contributions and assets in AIG stock was in keeping with the Plan's settlor's expectations of how a prudent fiduciary would operate.

166.    Accordingly, given AIG's misconduct, as described above, the Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in AIG stock.

167.    Moreover, the Defendants breached their co-fiduciary duty of prudence by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plan's assets with respect to offering AIG stock as an investment option in the Plan and providing company matching contributions in AIG stock despite knowing that such failure was a breach; enabling the Defendants' failure to prudently manage the Plan's assets with respect to the Plan's investments, including the match as a result of their own fiduciary breaches; and having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

168.    Specifically, in light of their high-ranking positions as officers and/or directors of AIG, at least some of the Defendants had actual knowledge of AIG's exposure to a deteriorating residential mortgage market and the false and misleading statements by AIG concealing such exposure. Despite this knowledge, the Defendants participated in each other's failures to prudently

41

manage the Plan's assets and knowingly concealed such failures by not informing Plan participants that the Plan's holdings of AIG stock were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in AIG stock, despite inarguably having knowledge of such breaches.

169.    Furthermore, through their own failure to prudently and loyally manage the Plan's investment in AIG stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, the Defendants named in this Count enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in AIG stock.

170.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their investments meant to help them save for retirement. Thus, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure To Provide Complete And Accurate Information To Participants And Beneficiaries (Breaches Of Fiduciary Duties In Violation Of ERISA § 404 By All Defendants)

171.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

172.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

173.    As alleged above, the scope of the Defendants' fiduciary duties and responsibilities included disseminating Plan documents and information to Plan participants regarding the Plan and its assets. In addition, the Defendants had a duty to provide Plan participants with information Defendants possessed that they knew, or should have known, would have a material impact on the Plan.

174.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform includes an obligation to provide Plan participants and beneficiaries with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that Participants can make informed decisions with regard to investment options available under the Plan, this duty applies to all of the Plan's investment options, including investment in AIG common stock.

175.    This fiduciary duty to communicate honestly with participants is designed not merely to inform participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Defendants facilitated the illegal conduct in the first instance.

176.    Because a substantial percentage of the Plan's assets were invested in AIG stock, and Defendants chose to invest overwhelmingly in AIG stock, such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to AIG stock.

177.    The Defendants breached their ERISA mandated duty to inform participants by failing to provide complete and accurate information regarding AIG and AIG stock, and, generally,

by conveying, through statements and omissions, false and misleading information regarding the soundness of AIG stock, and the prudence of investing retirement contributions in the stock.

178.    Specifically, throughout the Class Period, the Defendants issued false and misleading statements to Plan participants regarding the true nature of AIG's involvement in the residential housing market, particularly in subprime mortgages, the true strength of AIG's credit default swap portfolio, and the existence of material weakness in AIG's accounting practices.

179.    Upon information and belief, such communications were disseminated directly to all Plan participants, including the Prospectuses, which incorporated by reference AIG's materially misleading and inaccurate SEC filings and press releases, through its officers and directors. In addition, upon information and belief, AIG communicated directly with all Plan participants regarding the merits of investing in AIG stock in company-wide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding AIG stock as required by ERISA.

180.    In addition, the AIG Retirement Board and the AIG Investment Committee were responsible for providing Plan participants with investment education and communication. These Defendants, however, failed to disclose any information to Plan participants regarding the substantial risks posed by AIG's business practices how these practices adversely affected AIG stock as a prudent investment option under the Plan. The AIG Retirement Board and AIG Investment Committee thus breached their duty to provide participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plan.

181.    Defendants' failure to provide complete and accurate information to Plan participants about AIG and its common stock was particularly devastating to the Plan and its participants, as a

significant percentage of the Plan's assets were invested in AIG stock during the Class Period, with acquisitions of AIG stock occurring at significantly inflated prices. Thus, the stock's precipitous decline had an enormous impact on the value of participants' retirement assets. Had such disclosures been made to participants, or the Plan's fiduciaries, if any, who were not aware of the above, participants and fiduciaries could have taken action to protect the Plan, and the disclosure to participants itself, which necessarily have been accompanied by disclosure to the market, would have assured that any further acquisitions of AIG stock by the Plan would have occurred at an appropriate price.

182.    As a consequence of the Defendants' failure to satisfy their duty to provide complete and accurate information under ERISA, Plan participants lacked sufficient information to make informed choices regarding investment of their retirement savings in AIG stock, or to appreciate that under the circumstances known or that should have been known to the Defendants, but not known by the Plan's participants, that AIG stock was an inherently unsuitable and inappropriate investment option for their accounts.

183.    The Defendants' failure to provide complete and accurate information regarding AIG stock was uniform and affected the entire Plan, and impacted all participants in the Plan the same way in that none of the participants received crucial, material information regarding the risks of AIG stock as an investment option and all of the Plan's acquisitions of employer stock during the Class Period occurred at inflated prices.

184.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plan would have been minimized or avoided.

Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

185.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Failure To Monitor Appointed Plan Fiduciaries And To Provide Them With Complete And Accurate Information (Breaches Of Fiduciary Duties In Violation Of ERISA § 404 By AIG And Defendant Sullivan)

186.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

187.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

188.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

189.    At all relevant times, as alleged above, the scope of the fiduciary responsibilities of AIG and the other Defendants named in this Count included the responsibility to appoint, evaluate, and monitor other fiduciaries.  The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  The monitoring fiduciaries, AIG and the other Defendants named in this Count, had the duty to:

(a)     Ensure that the appointed Plan fiduciaries possessed the needed credentials and experience, or used qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(b)     Ensure that the appointed Plan fiduciaries were provided with adequate financial resources to do their job;

(c)     Ensure that the appointed Plan fiduciaries had adequate information to effectively do their job of overseeing the Plan's investments;

(d)     Ensure that the appointed Plan fiduciaries had ready access to outside, impartial advisors when needed;

(e)     Ensure that the appointed Plan fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investment options; and

(f)     Ensure that the appointed Plan fiduciaries reported regularly to AIG. AIG must then review, understand, and approve the conduct of the hands-on fiduciaries.

190.    The Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plan's investment in AIG stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Plan participants' investments in AIG stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of AIG's highly risky and inappropriate business and accounting practices, and the likely impact of such practices on the value of the Plan's investment in AIG stock; (c) to the extent any appointee lacked such information, failing to provide complete and

47

accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain huge investments in AIG stock despite their knowledge of practices that rendered AIG stock an imprudent investment during the Class Period for participants' retirement savings in the Plan, and who breached their fiduciary duties under ERISA.

191.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

192.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### COUNT IV:

### Breach Of Duty To Avoid Conflicts Of Interest
### (Breaches Of Fiduciary Duties In Violation Of
### ERISA §§ 404 And 405 By All Defendants)

193.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

194.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

195.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

196.    The Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia,* failing to engage independent advisors who could make independent judgments concerning the Plan's investment in AIG stock; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances (as discussed above) which made AIG stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Plan participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to AIG's inappropriate practices; and by otherwise placing their own and AIG's improper interests above the interests of Plan participants and beneficiaries with respect to the Plan's investment in AIG stock.

197.    In addition, on information and belief, the compensation and tenure of the Defendants was tied to the performance of AIG stock and/or the publicly reported financial performance of AIG. Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision making process is untainted by the conflict and made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the Plan.

198.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

199.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

### Co-Fiduciary Liability
### (Breaches Of Fiduciary Duties In Violation
### Of Erisa § 405 By AIG And Defendant Sullivan)

200.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

201.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if:  (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with ERISA § 1104(a)(l) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

202.    AIG, through its officers and employees, engaged in highly risky and inappropriate business practices, withheld material information from the market, provided the market with false

and misleading disclosures, and profited from such practices. Accordingly, knowledge of such improper practices is imputed to AIG as a matter of law.

203.    Defendant Sullivan, by virtue of his high-ranking position at AIG, participated in and/or knew about AIG's highly risky and inappropriate business and accounting practices as well as their consequences, including the artificial inflation of the value of AIG stock. Defendant Sullivan also issued many of the above-mentioned press releases and filings with the SEC which were false and misleading.

204.    Because AIG and Defendant Sullivan knew of AIG's improper business practices, they also knew that all Defendants were breaching their fiduciary duties by: (a) continuing to invest in AIG stock; and (b) providing incomplete and inaccurate information to Plan participants. Yet, they failed to undertake any effort to remedy these breaches. Instead, through false and misleading statements and omissions, they compounded them by downplaying the significance of AIG's improper business practices, and obfuscating the risk that the practices posed to AIG, and, thus, to the Plan.

205.    In addition, despite the fact that they knew, or should have known, about AIG's improper business and accounting practices, AIG, Defendant Sullivan, the AIG Retirement Board and the AIG Investment Committee ignored their monitoring responsibilities by permitting Defendants to breach their fiduciary duties.

206.    Moreover, the Defendants named in this Count enabled the imprudent asset management decisions of any and all other Defendants – including any appointed Plan fiduciaries – who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan

caused by AIG's improper business and accounting practices, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in AIG stock.  In so doing, these Defendants breached ERISA § 405(a)(l)(B).

207.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars of retirement savings.

208.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants are liable under co-fiduciary liability to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

### Knowing Participation In A Breach Of Fiduciary Duty (Breaches Of Fiduciary Duties In Violation Of ERISA §§ 404 And 502(A)(3) By AIG)

209.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

210.    To the extent that AIG is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, AIG knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

211.    AIG benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by the Plan, contributing AIG stock to the Plan while the value of the stock was inflated as the result of AIG's highly risky and improper business and accounting practices, and providing the market with materially misleading statements and omissions. Accordingly, AIG may be required to disgorge this benefit or a constructive trust should be imposed

on treasury shares of AIG stock that would have been contributed to the Plan, but for AIG's participation in the foregoing breaches of fiduciary duty.

## CAUSATION

212.    The Plan suffered hundreds of millions of dollars in losses because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in AIG stock during the Class Period, in breach of Defendants' fiduciary duties.

213.    Defendants are liable for the Plan's losses in this case because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants withheld material, non-public information from the Plan's participants, and provided inaccurate and incomplete information to them regarding the true financial health and ongoing profitability of AIG, and its soundness as an investment vehicle. As a consequence, participants could not exercise independent control over their investments in the AIG stock, and Defendants remain liable under ERISA for losses caused by such investments.

214.    Had the Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in AIG stock, eliminating AIG stock as an investment alternative when it became imprudent, and divesting the Plan of AIG stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it, and indirectly, the participants suffered.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

215.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the assets of the Plan should not have been invested in AIG stock during the Class Period.

216.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

217.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "my person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to such plan any losses to the plan..." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate..."

218.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained its investments in the challenged investment and, instead, prudent fiduciaries would have invested the assets of the Plan in the most profitable alternative investment available to them. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

219.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and

other applicable law; (4) taxable costs and interests on these amounts, as provided by law; and (5) such other legal or equitable relief as may be just and proper.

220.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan, and indirectly, the Plan's participants in this case.

## PROHIBITED TRANSACTION
## IN VIOLATION OF ERISA § 406

221.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

222.    By virtue of all the facts and events alleged herein, Defendants, in connection with their action and omissions in authorizing and causing the Plan to continue to offer the AIG stock as an investment option during the Class Period and permitting Plaintiff and members of the Class to invest in AIG stock at a time when Defendants reasonably should have known that AIG's operational and financial health were deteriorating – material facts undisclosed or misrepresented to the public – and that as a result, the prices per share at which the Plan was acquiring AIG common stock grossly exceeded fair market value, caused the Plan to engage in transactions that constituted direct or indirect sales or exchanges of property between the Plan and the party-in-interest, in violation of ERISA § 406(a), 29 U.S.C. § 1106(a).

223.    Because the price Defendants caused the Plan to pay for such shares was materially and artificially inflated, exceeding fair market value, the prohibited transactions are not exempt under the provisions of ERISA § 408(e)(1), 29 U.S.C. § 1108(e)(1).

224.    AIG is liable for this violation as a "party in interest" as defined in ERISA § 3(14)(c) for participating in the prohibited transactions.

225.    During the Class Period, AIG common stock was artificially inflated in value such that Defendants continued to engage in prohibited transactions by causing the Plan to pay an artificially inflated price for AIG common stock.

226.    During the Class Period, the Plan invested, upon information and belief, millions of dollars in both participant and company-matching contributions in AIG common stock, at artificially inflated prices. The Plan and its participants thus over-paid for their "participation interests" in the Plan.

227.    Because the Plan's acquisition of AIG common stock at artificially inflated prices were prohibited transactions, a *per se* violation of ERISA § 406(a), 29 U.S.C. §1106(a), under ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff seeks on behalf of herself and the members of the Class to rescind all transactions purchasing shares of AIG stock.

228.    Further, to restore the Plan and its participants and beneficiaries to the positions they would have been in had Defendants not engaged in the prohibited transactions, the Plan is entitled to recover the amount that the contributions used to purchase AIG commons stock for the Plan would have earned had such amounts been invested in suitable investment options.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    Declaring this action to be a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Defendants, together and individually, breached their fiduciary duties under ERISA to Plaintiff and members of the Class;

C.    Declaring that Defendants, together and individually, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(1)(B);

D.    Compelling Defendants to reimburse the Plan for all losses thereto, resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the assets of the Plan, and to restore to the Plan all profits Defendants made through the use of the assets of the Plan, and to restore to the Plan all investment profits that Plaintiff and member of the Class would have made if Defendants had fulfilled their fiduciary obligations;

E.    Enjoining Defendants, together and individually, from any further violations of their fiduciary duties under ERISA;

F.    Awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the individual accounts of Plaintiff and members of the Class in proportion to the losses of those accounts;

G.    Awarding Plaintiff and members of the Class damages as a result of the wrongs complained of herein, with pre-judgment and post-judgment interest;

H.    Awarding Plaintiff and members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

I.    Awarding Plaintiff and members of the Class such other and further relief as the Court may deem just and proper.

Dated: July 3, 2008

SQUITIERI & FEARON, LLP

By:_____
        Lee Squitieri (OS-1684)
        Stephen J. Fearon, Jr. (SF-8119)
32 East 57th Street
12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553

WEXLER TORISEVA WALLACE
Kenneth A. Wexler
55 West Monroe Street
Suite 3300
Chicago, Illinois 60603
(312) 346-2222

*Counsel for Plaintiff*